Andre JONES, Petitioner–Appellant,

v.

Thomas F. PAGE, Warden, Menard Correctional Center, and James Ryan, Attorney General of the State of Illinois, Respondents–Appellees.

No. 95–1200.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 13, 1995.

Decided Feb. 9, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied April 3, 1996.

---

Marshall J. Hartman, Capital Resource Center, Chicago, IL, Howard B. Eisenberg (argued), Milwaukee, WI, for Petitioner–Appellant.

Rita M. Novak, Office of the Attorney General, Chicago, IL, Michael A. Hurst (argued), Office of the Attorney General, Criminal Appeals Division, Chicago, IL, for Respondents–Appellees.

Before BAUER, COFFEY and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

Andre Vernell Jones, an Illinois prisoner sentenced to death on murder charges, appeals from a judgment of the district court denying his petition for a writ of habeas corpus.

Jones and a co-defendant, Freddie Tiller, were indicted in the Circuit Court for St. Clair County, Illinois and charged with the killing of three individuals—Richard Stoltz, Samuel Nersesian, and Debra Brown—in East St. Louis, Illinois on April 30, 1979. The indictment alleged that the defendants acted "without lawful justification and with the intent to kill," in violation of the Illinois murder statute. Ill.Rev.Stat. ch. 38, para. 9–1(a)(1) (1979). The court accepted Jones's plea of guilty to all three counts of murder. On April 15, 1980, a jury sentenced Jones to death by electrocution on each of the three counts, pursuant to the Illinois death penalty statute, Ill.Rev.Stat. ch. 38, para. 9–1 (1979). The petitioner's convictions for all three murder counts were upheld on direct appeal to the Illinois Supreme Court, but the death sentence imposed for the murder of Stoltz was vacated.

After exhausting his available state-court appeals, which included his direct appeal to the Illinois Supreme Court and two unsuccessful petitions for post-conviction relief, Jones sought federal habeas corpus relief pursuant to 28 U.S.C. § 2254. The district court dismissed his petition on December 27, 1994. We affirm.

## I. BACKGROUND

### A. The Murders of Stoltz, Nersesian & Brown

The underlying facts are undisputed. Because the factual findings of a state trial or appellate court are presumed to be correct when reviewed in a federal court via a habeas petition, Sumner v. Mata, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) (interpreting 28 U.S.C. § 2254(d)), we incorporate the brief factual summary provided by the Illinois Supreme Court upon consideration of Jones's direct appeal in 1982:

> The testimony and defendant's confession showed that on the morning of April 30, 1979, defendant left his apartment carrying a .22–caliber Rohm revolver. Defendant and his girlfriend [Laurie Elam] walked until they met with [Freddie] Tiller. The three of them walked until they saw an elderly man, Richard Stoltz, standing in the back of a pickup truck, stacking bricks. Tiller, stating that he was going to rob Stoltz, asked defendant for his gun. Defendant gave his gun to Tiller, who told Stoltz, "This is a stickup." Stoltz raised his hands, and Tiller fired the gun, striking Stoltz in the left eye. Tiller then took a wallet, keys and a wrist watch from Stoltz' body. Defendant and Tiller rejoined the girlfriend, who had crossed the street.

They continued their walk until they arrived at the Illinois Cleaners, located across the street from Jones' apartment. The girlfriend left after being told by defendant to go home. Defendant then suggested that he and Tiller rob the cleaners, and Tiller agreed. Defendant and Tiller entered the store and, once inside, defendant shot the proprietor, Samuel Nersesian, in the head. He fell to the floor, and defendant shot him again. Defendant then opened the cash register and took an undetermined amount of money. As they were about to leave, a mail carrier, Debra Brown, who had arrived in a mail truck, entered the store. Defendant hid behind the door, and when Miss Brown entered, defendant grabbed her around the neck from behind. He pushed her back through a kitchen located at the rear of the business and into a storage room. There defendant knocked her down, shot her in the chest, and then shot her in the mouth. Defendant and Tiller then left the store. Tiller left the scene in the mail truck, and defendant walked across the street to his apartment. All three of the shooting victims died.

*People v. Jones,* 94 Ill.2d 275, 281–82, 68 Ill.Dec. 903, 447 N.E.2d 161 (1982), *cert. denied,* 464 U.S. 920, 104 S.Ct. 287, 78 L.Ed.2d 264 (1983) (*Jones I* ).

### B. *Entry of Guilty Plea*

Subsequent to the indictment of Jones and Tiller on June 8, 1979 for the murders of Stoltz, Nersesian, and Brown, a public defender was appointed and withdrew from the case on July 11, 1979, after which the court appointed Robert Gagen to represent the petitioner. Gagen was a former public defender who had also served as a judge in the criminal division of the St. Clair County Circuit Court. Before the plea proceedings in Jones's case, Gagen reviewed the investigative file of the prosecuting attorney, interviewed Jones's girlfriend (who was with him on the day of the murders), spoke with the attorney representing Jones's accomplice, and interviewed the police officer who took Jones's confession. Additionally, he met with his client numerous times. Gagen also contacted Cheryl Prost, a psychological consultant for the court who was counseling Jones. Prost informed Gagen that she believed the defendant was sane at the time of the offense and was also competent to stand trial.[1]

After conducting this investigation, Gagen, calling upon years of experience both as an attorney and a criminal court judge, concluded that there was no factual defense to the murder charges and that an insanity or intoxication defense was untenable. On August 23, 1979, the petitioner, acting on Gagen's advice, withdrew an earlier not guilty plea and entered a plea of guilty to the three murder charges contained in the indictment.[2] At the time of this plea, the trial judge, John J. Hoban, advised Jones of his constitutional rights to a jury trial, the presumption of innocence, the state's obligation to prove his guilt beyond a reasonable doubt, the right to present a defense and to call witnesses, the right to remain silent, and the right to consult with an attorney. The court took pains to impress upon Jones the gravity of his situation and to make clear the potential consequences of a guilty plea:

> THE COURT: Also for each one of these murders, if you enter a plea of guilty, I want you to understand that if certain factors are present, you could be sentenced to death, on each one of them.... [I]f the factors which are necessary ... are pres-

---

1. In a written report filed with the court August 30, 1979 (one week *after* Jones pleaded guilty), Prost concluded:

    [N]o pathology was found concerning psychosis or mental retardation nor significant substance abuse. What has been found is a very pathological personality disorder which has been present since childhood and which has not changed through the efforts of numerous state penal institutions. Mr. Jones has had poor control over his anger and impulsiveness as well as had little respect for the rights and lives of others.
    *Report of Psychological Evaluation,* Record, Vol. III at C–591.

2. In her evaluation, see note 1 *supra,* Prost stated that Jones had "decided to plead guilty ... when he saw no possible defense or excuse for these crimes." *Report of Psychological Evaluation,* Record, Vol. III at C–588.

ent, I wouldn't hesitate to sentence you to death.

*     *     *     *     *     *

THE COURT: So if there's any thought in your mind that by pleading guilty I might give you natural life, I want to erase that thought from your mind. Because if they prove the factors ... I won't hesitate to sentence you to death. You understand that?

THE DEFENDANT: Yes sir.

*     *     *     *     *     *

THE COURT: Now, is there any question that you want to ask me at this time, anything that you don't understand just ask me and I will answer it to the best of my ability.

THE DEFENDANT: Yes, sir. Well, there's one thing, if I understood [State's Attorney] Mr. Kuehn correctly, he said that the death penalty will be asked for even on a plea of guilty, if I'm not mistaken.

THE COURT: That's correct.

THE DEFENDANT: I understand the natures of the offenses which I have been charged with. That's it sir.

The court also explored whether improper coercion or promises had influenced Jones's decision to plead guilty:

THE COURT: Has anyone used any threats to get you to come in here and indicate through your attorney that you would enter a plea of guilty, anybody threaten you or said, if you do it we'll let you do this, we'll recommend that. Any kind of promises or threats whatsoever? Did anyone make them to you?

THE DEFENDANT: No sir.

When the court asked Jones if Gagen had advised him of his rights and if he thought Gagen had represented him "in a proper way," the defendant replied in the affirmative.

## C. *Jones's Confession to the Wallace Double Murder*

On August 30, 1979 (after Jones entered his guilty plea but before sentencing), Detective Robert Miller of the St. Clair County Sheriff's Office interviewed Jones at the county jail to determine whether he could provide information about any other unsolved crimes in the area. Miller informed Jones of his *Miranda* rights and Jones signed a written waiver of those rights at the outset of the interview (one and a half or two hours). While speaking to Miller, Jones reflected on his criminal record and observed that he had only been caught when a victim or a witness had survived to identify him. He stated that for this reason, he had resolved, the last time he was in the penitentiary, "that he would never be identified by a witness or victim again, that he would destroy them." Jones hinted that he had knowledge pertaining to several unsolved crimes, but provided little detail at this initial interview.

Acting on his own initiative, Jones on September 1, 1979 summoned Detective Miller to the jail and handed him a six-page, handwritten document confessing to the November 1978 murders of Michael and Dora Wallace in East St. Louis. The statement recounts decapitating Mr. Wallace and stabbing Mrs. Wallace before torching their house. Miller, who knew little about the Wallace murders at the time, left the jail without questioning Jones about the confession. However, he met with Jones "a couple of times after that concerning the statement." Jones provided specific details about the murders and the murder scene during the meetings that were conducted after he submitted his confession. The information Jones related during these meetings served to corroborate his handwritten statement. During the course of these conversations, the defendant arranged for an unidentified female to deliver to law enforcement officers the butcher knife used in the murder (knife subsequently identified as belonging to the Wallaces). The record is silent as to whether Jones was informed of his constitutional rights during any of the interviews subsequent to the meeting on September 1 (at which he handed his written confession to Detective Miller), nor does it reveal whether Jones provided information voluntarily or in response to follow-up questioning.

Gagen, who represented Jones as of August 23, 1979, was not present for any of the interviews concerning the Wallace homicides.

The record indicates that Gagen had no knowledge of the Wallace murders or of Jones's confession until after the confession had been delivered to Detective Miller. Gagen testified that "it seemed like every time I went back to the jail I was given another confession to some other crime or murder or series of murders that Mr. Jones was confessing to.[3] I talked to the deputies and asked them not to talk to the defendant, but I was told ... that if any defendant wanted to talk to them, as long as he was Mirandized, that they felt they had a right to talk to him, because they would not talk to him about the incidents that I was representing him on, but these were completely different matters."

### D. *Sentencing*

On August 28, 1979, the court accepted Jones's pleas of guilty to the three counts of murder in the indictment, entered a judgment of guilty on all three counts, and ordered a pre-sentence investigation report. On October 5, 1979, the court conducted a hearing on Jones's motion to waive his right to have a jury determine his sentence for the murders of Stoltz, Nersesian, and Brown.[4] Jones testified that he wished to proceed without a jury, although he was well aware that the judge could sentence him to death. Again, Judge Hoban was careful to establish, for the record, through his questioning and Jones's responses, that the defendant fully understood his waiver decision and that no

one had used any threats or promises to induce his decision to waive jury sentencing.

On October 11, 1979, Gagen moved for a continuance of the sentencing hearing and for an independent psychiatric evaluation of his client (prompted by Jones's recent revelations concerning the brutal slayings of the elderly Mr. and Mrs. Wallace). Pursuant to the court's order, Jones was evaluated by Peter P. Heinbecker, M.D., a psychiatrist who concluded in late November 1979 that the defendant was sane at the time of the murders of Stoltz, Nersesian, and Brown.[5] Heinbecker did not express an opinion as to whether Jones was sane at the time of the Wallace murders (nor was he specifically asked to do so, as far as the record reveals). Jones told Heinbecker that he had killed "thirteen or fourteen people" and asserted that "when he was killing someone he had this experience of hearing [a] voice or voices telling him to hurt or kill." Jones would not discuss these other murder incidents with Heinbecker in any detail, nor did he indicate to Heinbecker when they occurred. Heinbecker expressed skepticism over Jones's claim to have heard voices while killing.[6]

On April 14–15, 1980, a jury sentenced Jones to death on each of these three murder counts, pursuant to the Illinois death penalty statute. Ill.Rev.Stat. ch. 38, para. 9–1 (1979). That statute confers a right to sentencing by jury in capital murder cases, but also allows the defendant to waive jury sentencing. As we pointed out earlier, initially Jones opted

---

**3.** In addition to his handwritten confession to the Wallace murders, Jones verbally admitted to several other crimes, including the murder of a Ronald Gusewelle in early April 1979. Jones later recanted the confession of the Gusewelle homicide, claiming that Detective Miller furnished him with information about the murder and that Miller had threatened him and also provided him with money and valium as inducements to confess. See *People v. Boyle*, 161 Ill. App.3d 1054, 113 Ill.Dec. 158, 162, 514 N.E.2d 1169, 1173 (5 Dist.1987). We omit a lengthy discussion of Jones's confessions to the Gusewelle murder and other crimes because these confessions were not introduced in evidence at Jones's sentencing hearing and are not at issue in this appeal.

**4.** The Illinois death penalty statute conferred a right to be sentenced by a jury, but allowed a hearing "before the court alone if the defendant

waives a jury for the ... proceeding." Ill.Rev. Stat. ch. 38, para. 9–1(d)(3) (1979).

**5.** Heinbecker concluded: "It is my opinion that at the time of the crimes [he is charged with committing] on April the 30th 1979, Andre Jones did not lack substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, as a result of mental disease or defect." Heinbecker also concluded that Jones was "able to understand the nature and purpose of the proceedings against him, and ... to assist in his own defense."

**6.** Jones himself later told Gagen that he thought the statement about hearing voices "sounded good," suggesting that Jones was less than truthful with Dr. Heinbecker in an attempt to persuade him that he was insane.

to waive jury sentencing and be sentenced by Judge Hoban; the record is silent as to what caused him to change his mind later and request sentencing before a jury. During the sentencing hearing, the State introduced evidence of aggravating factors, including Jones's criminal history and his confession of the Wallace murders. Although Gagen moved to exclude Jones's confession to the Wallace murders on the basis that it had been obtained in violation of the Sixth Amendment, the judge denied the motion and admitted the confession in evidence, along with the knife given to police as well as testimony concerning the Wallace murders from the St. Clair County coroner and an East St. Louis police officer. Jones did not testify, although Gagen stated for the record (outside the presence of the jury) that the defendant's decision not to take the stand was contrary to his advice. The defense rested without presenting any mitigating evidence, but Gagen did make a closing argument on behalf of Jones. After deliberating for some twenty minutes, the jury found no mitigating factors sufficient to preclude a sentence of death and rendered a verdict in accordance therewith, sentencing Jones to death by electrocution on each of the three murder counts. Sentences were stayed pending appellate proceedings in the state and federal courts.

### E.  Appellate Proceedings in State Court

In his direct appeal to the Illinois Supreme Court, Jones asserted, inter alia, that the Illinois death penalty statute was unconstitutional because it failed to provide "sufficient guidelines to enable a jury to properly determine when the death penalty may be imposed." Jones I, at 282–88, 68 Ill.Dec. 903, 447 N.E.2d 161. Jones further alleged that his confession to the Wallace murders was improperly admitted at sentencing because it had been obtained in violation of the Sixth Amendment. Jones's new counsel, David C. Hoffman (appointed by the Illinois Supreme Court), considered but rejected an additional argument: that Jones had been denied the effective assistance of counsel at the plea and sentencing stages. The Illinois Supreme

Court found neither constitutional infirmity in the Illinois death penalty statute nor reversible error in the lower court's rulings, and affirmed each of Jones's three murder convictions. Jones I. However, because the record failed to establish that Jones "killed, attempted to kill, or intended to kill [Stoltz]" (Jones's co-defendant fired the shot that killed Stoltz), the court vacated the death sentence imposed for the Stoltz murder. Id. at 915, 447 N.E.2d at 173 (citing Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982)). The United States Supreme Court denied Jones's petition for a writ of certiorari concerning the convictions and the two death sentences imposed for the murders of Nersesian and Brown. Jones v. Illinois, 464 U.S. 920, 104 S.Ct. 287, 78 L.Ed.2d 264 (1983).

The petitioner, Jones, next brought a petition in state court for post-conviction relief, asserting for the first time that he was denied the effective assistance of counsel at the plea and sentencing stages of his prosecution. The Circuit Court for St. Clair County dismissed the petition and denied Jones's request for a hearing on the ineffective assistance of counsel claim. Affirming the circuit court on appeal, the Illinois Supreme Court noted that "res judicata applies to the defendant's [ineffective assistance of counsel] claim or, stated in another way ... he waived the claim ... by failing to raise it in the first appeal." People v. Jones, 109 Ill.2d 19, 92 Ill.Dec. 552, 554, 485 N.E.2d 363, 365 (1985), cert. denied, 475 U.S. 1090, 106 S.Ct. 1481, 89 L.Ed.2d 735 (1986) (Jones II ).

A second petition for post-conviction relief fared no better. Jones, now represented by substituted counsel,[7] argued (1) that Gagen, his trial counsel, had been ineffective and (2) that Hoffman had been ineffective for failing to challenge Gagen's competency in the direct appeal and in the first post-conviction petition proceeding. This time Gagen, Jones, and others testified at an evidentiary hearing, but the circuit court again denied relief. The Illinois Supreme Court affirmed, concluding that neither Gagen's nor Hoffman's

---

7.  Howard B. Eisenberg, Esq. entered his appearance on behalf of Jones on September 4, 1986 and submitted a petition for post-conviction relief on the same date.

representation had been constitutionally ineffective. *People v. Jones,* 144 Ill.2d 242, 162 Ill.Dec. 15, 579 N.E.2d 829 (1991), *cert. denied,* 505 U.S. 1223, 112 S.Ct. 3038, 120 L.Ed.2d 906 (1992) (*Jones III* ).

### F.  *District Court Proceedings*

In the district court, Jones asserted as grounds for *habeas* relief:  (1) denial of the constitutional right to effective representation of counsel at the plea, sentencing, direct appeal, and first post-conviction petition proceedings, (2) the admission of "other crimes" evidence at the sentencing hearing (principally, the confession to the Wallace murders, obtained in violation of the Sixth Amendment right to counsel), (3) the unconstitutionality of the Illinois death penalty statute, and (4) the admission of hearsay evidence at sentencing, in violation of the right to due process. On December 27, 1994, following extensive briefing, oral argument, and a review of the record, the district court rejected the petitioner's claims and dismissed the petition. *Jones v. Welborn,* 877 F.Supp. 1214 (S.D.Ill. 1994).

The district court analyzed and rejected each of the petitioner's claims of ineffective assistance of counsel, applying the *Strickland* standard to the alleged deficiencies of Jones's counsel at the plea, sentencing, and post-conviction stages of his case. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  As for the petitioner's claim that the admission of "other crimes" evidence at his sentencing hearing violated the Sixth Amendment, the district court *sua sponte* invoked *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and the harmless error doctrine to dispose of the Sixth Amendment claim on collateral review.

### II.  ISSUES

Broadly speaking, this appeal presents two issues: (1) whether, at any stage of the proceedings in state court, the petitioner was denied the effective representation of counsel guaranteed by the U.S. Constitution, and (2) whether the "other crimes" evidence admitted at Jones's sentencing hearing (i.e., the evidence concerning the Wallace murders) was obtained in violation of his right to coun-

sel under the Sixth Amendment.  In addressing the second issue, we review the approach taken by the district court and consider (1) whether the district court abused its discretion by raising the *Teague* issue *sua sponte,* (2) whether the petitioner's Sixth Amendment claim is barred by *Teague v. Lane,* and (3) whether, if the petitioner's claim with respect to portions of the evidence is *not* barred by *Teague,* the admission of that evidence in violation of the Sixth Amendment mandates *habeas* relief for the petitioner or is subject to "harmless error" analysis.

### III.  DISCUSSION

### A.  *Standard of Review*

The *habeas corpus* jurisdiction of this court under 28 U.S.C. § 2254 extends only to violations of federal statutory or constitutional law.  *Brewer v. Aiken,* 935 F.2d 850, 854–55 (7th Cir.1991).  The constitutional provision invoked by Jones in this *habeas* proceeding is the defendant's right to counsel in a criminal prosecution, which is guaranteed by the Sixth Amendment to the United States Constitution.  " 'Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive for it affects his ability to assert any other rights he may have.' "  *United States v. Cronic,* 466 U.S. 648, 654, 104 S.Ct. 2039, 2044, 80 L.Ed.2d 657 (1984) (quoting Schaefer, *Federalism and State Criminal Procedure,* 70 Harv.L.Rev. 1, 8 (1956)).

As this court observed recently, "[w]hen considering a district court's decision to grant or deny a petition for a writ of habeas corpus, we review questions of law *de novo,*" while factual determinations made by the state trial and appellate courts are considered "presumptively correct."  *Rodriguez v. Peters,* 63 F.3d 546, 554 (7th Cir.1995) (citations omitted).

### B.  *Ineffective Assistance of Counsel*

#### 1.  *Strickland v. Washington*

The Supreme Court has recognized that "the right to counsel is the right to the *effective* assistance of counsel."  *McMann v.*

*Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970) (emphasis added). As the Court explained in *Strickland v. Washington,* however, whether counsel is effective or ineffective does not turn on the defendant's subjective pleasure or displeasure with counsel's performance. There are two essential elements to a successful claim of ineffective assistance of counsel:

> *First,* the defendant must show that *counsel's performance was deficient.* This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Second,* the defendant must show that the *deficient performance prejudiced the defense.* This requires showing that counsel's errors were so serious as to deprive defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes *both* showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687, 104 S.Ct. at 2064 (emphasis added).

The two-part *Strickland* test[8] applies to the alleged ineffectiveness of Jones's trial counsel, Robert Gagen, in connection with the plea hearing, as well as the sentencing stage of the proceedings. *Hill v. Lockhart,* 474 U.S. 52, 58, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985). The petitioner not only argues that Gagen was ineffective, but also that his first appellate counsel, Hoffman, was ineffective for failing to raise the issue of trial counsel's ineffectiveness. Obviously, if the petitioner's claims respecting Gagen fail, then his claims respecting Hoffman also fail.

This court has stated that a defendant "bears a heavy burden when seeking to establish an ineffective assistance of counsel claim," *Drake v. Clark,* 14 F.3d 351, 355 (7th Cir.1994); *see also Kimmelman v. Morrison,* 477 U.S. 365, 383, 106 S.Ct. 2574, 2587, 91 L.Ed.2d 305 (1986) (describing *Strickland* test as "highly demanding"). The extent of the defendant's burden is evident when one analyzes the Supreme Court's language in *Strickland* and its progeny explaining each of the components: deficient performance and prejudice. With respect to the former, the Court has stated:

> *Judicial scrutiny of counsel's performance must be highly deferential.* It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence [or guilty plea], and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that *every effort be made to eliminate the distorting effects of hindsight,* to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, *a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance;* that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'

*Strickland,* 466 U.S. at 669, 104 S.Ct. at 2055 (emphasis added).

Concerning the "prejudice" element, the Court has stated that "the defendant must show that there is a probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. In other words, deficient performance, by itself, "does not warrant setting aside the judgment of a

---

8. In *Strickland,* the Supreme Court identified both the performance and prejudice components of the ineffectiveness inquiry as "mixed questions of law and fact." 466 U.S. at 698, 104 S.Ct. at 2070. The Court has also stated that mixed questions in habeas proceedings are subject to plenary review. *Miller v. Fenton,* 474 U.S. 104, 112, 106 S.Ct. 445, 450–51, 88 L.Ed.2d 405 (1985), and traditionally, this court has reviewed

ineffectiveness claims in the habeas context *de novo. See, e.g., Hockett v. Duckworth,* 999 F.2d 1160, 1165 (7th Cir.1993). We see no reason to depart from that practice in this capital habeas case, despite the general trend in this circuit towards "clearly erroneous" review of mixed questions. *See United States v. Baldwin,* 60 F.3d 363, 365 (7th Cir.1995) (involving direct appellate review of a mixed question of law and fact).

criminal proceeding if the error had no effect on the judgment." *Id* at 691, 104 S.Ct. at 2066. A reviewing court, moreover, may not focus solely on "outcome determination," i.e., whether the result would have been different but for counsel's errors. *Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1992). Rather, the court on review must make an additional determination that the actual result of the proceeding was "fundamentally unfair or unreliable." *Id.* Finally, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." *Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069; *see also Lewis v. Lane,* 832 F.2d 1446, 1459 (7th Cir.1987), *cert. denied,* 488 U.S. 829, 109 S.Ct. 83, 102 L.Ed.2d 59 (1988) ("reaching the prejudice issue first will often obviate the need to rule definitively on the more difficult performance question.").

With the rigorous nature of the *Strickland* test firmly in mind, we will address the petitioner's argument that he was denied the effective representation of counsel. However, in light of the district court's thorough and proper analysis, we will not re-visit each of the petitioner's allegations of ineffective assistance of counsel. Rather, we will focus on those specific areas that we believe merit further consideration by this court. We will also consider whether, under the "totality of the circumstances," Jones was denied the effective representation of counsel.

### 2. *Plea Stage*

The petitioner presented the district court with a veritable catalog of ineffective assistance claims arising out of Gagen's representation of Jones during the plea process. Jones claimed that Gagen was ineffective because he (1) failed to investigate possible defenses, (2) coerced Jones into pleading guilty, (3) failed to file discovery requests or written motions, (4) withdrew motions filed by Jones's previous counsel, (5) failed to negotiate a plea agreement, (6) failed to investigate facts and subpoena witnesses, and (7) generally failed to prepare for the proceedings or to present a defense.

Perhaps the most serious allegation pertaining to the alleged ineffectiveness of counsel in this case is the petitioner's claim that Gagen failed to adequately investigate all of the possible defenses available to his client. Specifically, Jones claims that Gagen failed to investigate his psychological history, drug problems, or the possibility of an insanity defense prior to the entry of a guilty plea. This court has held that "[w]here the record establishes that counsel had reason to know, from an objective standpoint, that a possible defense, such as insanity, [was] available, failure to investigate fully can constitute ineffective assistance of counsel." *United States ex rel. Rivera v. Franzen,* 794 F.2d 314, 317 (7th Cir.1986), *cert. denied,* 479 U.S. 991, 107 S.Ct. 588, 93 L.Ed.2d 590 (1986). However, the Sixth Amendment does *not* mean that "defense attorneys have a general obligation to explore their clients' mental capacity in every case." *Id.* In fact, a defense attorney is *"not require[d] ... to pursue defenses that are not reasonably suggested by the apparent factual circumstances surrounding the crime charged or the subsequent demeanor and conduct of the client." Id.* (emphasis added).

Gagen testified, at the evidentiary hearing held in connection with Jones's second post-conviction petition, that he was conscious of the "overwhelming" evidence of his client's guilt and was "looking for a defense, any kind of a defense." One possible defense was intoxication, which Gagen ruled out after interviewing Jones and his girlfriend (Laurie Elam), who was with Jones immediately prior to the murders and who witnessed the murder of Stoltz. Furthermore, Jones told Gagen that he was not under the influence of drugs or alcohol at the time of the murders, and Elam confirmed this. Another possible defense under Illinois law was insanity. *See People v. Grant,* 71 Ill.2d 551, 17 Ill.Dec. 814, 377 N.E.2d 4 (1978). Did Gagen's performance fall "below an objective standard of reasonableness," as the petitioner claims, because he failed to pursue an insanity defense?

Before asking what Gagen actually *did* do by way of investigation, we initially must consider what constitutes the "duty to inves-

tigate" under controlling case law. *Strickland* itself involved, *inter alia*, a claim that the defendant's lawyer had been ineffective for failing to request a psychiatric examination of his client. Consequently, *Strickland* has a good deal to say about the "duty to investigate" both generally and in the specific context of a possible insanity defense:

> strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgements support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, *a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgements.*
>
> *[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless* or even harmful, *counsel's failure to pursue those investigations may not later be challenged as unreasonable.*

466 U.S. at 691, 104 S.Ct. at 2066 (emphasis added).

■ As an initial matter, we observe that Gagen *did—prior to the guilty plea—*conduct an inquiry into the mental status of his client by conferring informally with Cheryl Prost, the court psychologist who had been counseling Jones since his arrest. Prost advised Gagen that in her opinion, Jones was sane at the time of the offense and further was competent to stand trial (an opinion that was later confirmed in a written report submitted to the court).[9] Although Gagen did not request a full-scale mental evaluation of his client *before* recommending a plea of guilty, there was nothing to suggest that this level of inquiry was appropriate at this juncture of the proceedings. Jones had not, as of that

date, submitted his confession to the violent Wallace murders, in which he stated that "voices" guided his actions, nor did Gagen observe any unusual or suspect behavior on the part of his client that would warrant further inquiry into Jones's mental state. Gagen was well-versed in the area of mental competency, for he was not only an experienced criminal defense attorney, but had also served as a trial judge in the criminal division for some four years, where he presided over many cases involving the issue of mental competency. He met with Jones on numerous occasions[10] prior to the guilty plea and had ample opportunity to observe and assess Jones's demeanor. "When I talked to him," Gagen testified, "he understood the nature of the charges, he cooperated with me in every way.... I thought he had good recall of the details, that he understood what he was charged with and he understood what he was doing." Gagen also testified that Jones seemed remorseful and that he thought Jones would make an effective witness at the sentencing hearing. In short, Jones himself gave Gagen no reason to question his sanity or his competency: as far as the record reveals, neither the defendant nor his family requested a psychiatric examination or evaluation, nor did Jones exhibit any unusual behavior, during private meetings with Gagen or in court proceedings, that would serve to indicate to a reasonable attorney (with Gagen's background and experience) the need for exhaustive inquiry into his mental condition. *See Balfour v. Haws*, 892 F.2d 556, 564 (7th Cir.1989) (attorney's decision not to investigate defendant's mental history was reasonable because defendant "displayed many signs that he was sufficiently in touch with reality to understand his circumstances and to aid his attorney."). In deciding not to pursue an insanity defense, Gagen also relied upon his interview with the defendant's girlfriend, Laurie Elam, which helped to per-

---

9. When Gagen was asked whether he contacted Prost before or after the plea of guilty, he responded "Oh, I'm sure before. One of the first problems that I wanted to straighten out was the defendant's competency." The Illinois Supreme Court accepted Gagen's testimony on this important factual point. *See Jones III*, 162 Ill.Dec. at 22, 579 N.E.2d at 836.

10. Gagen estimated that he met with Jones a total of at least twenty times during the course of his representation and that they had "many discussions" concerning the guilty plea.

suade him that Jones was sane at the time the murders were committed.

We refuse to hold, on the record presented, that Gagen's performance was deficient because he failed to investigate an insanity defense more aggressively. "[I]f it is reasonable in the circumstances not to conduct a particular investigation, [a] lawyer's failure to do so will not establish ineffective representation." *Earl v. Israel*, 765 F.2d 91, 93 (7th Cir.1985), *cert. denied*, 474 U.S. 951, 106 S.Ct. 350, 88 L.Ed.2d 300 (1985). Gagen was an experienced criminal defense attorney as well as a former judge with experience in dealing with psychiatric problems in criminal trials. Gagen's consultation with Prost (who offered the opinion that Jones was sane at the time of the murders), Gagen's own evaluation of Jones, and his interview with Elam all served to persuade him that an insanity defense would be meritless and inappropriate. Without a doubt, this is a conclusion that a reasonable attorney, in the exercise of proper professional judgment, could reach under the circumstances presented to Gagen.

The fact that an insanity defense may have been the *only* defense available to Jones does not change our analysis, for "[i]f there is no *bona fide* defense to [a] charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade." *Evans v. Meyer*, 742 F.2d 371, 374 (7th Cir.1984) (quoting *Cronic*, 466 U.S. at 656 n. 19, 104 S.Ct. at 2046 n. 19). All too often, criminal defense attorneys are willing to pursue an insanity defense without a proper or sound basis for doing so, and unfortunately lawyers representing criminal defendants have been known to enlist psychiatric witnesses who inappropriately "tailor their testimony to the particular client whom they represent." *Burrus v. Young*, 808 F.2d 578, 595 (7th Cir.1986) (Coffey, J. concurring) (quoting *Steele v. State*, 97 Wis.2d 72, 294 N.W.2d 2, 13 (1980)). Although on occasion such tactics have been successful, from the criminal defendant's point of view, more often they serve to bring discredit to the legal and medical professions and waste judicial resources. *Id.; see also* Charles Krauthammer, *The Devil (or Twinkies) Made Them Do It*, Detroit News, Nov. 2, 1993, at 11A

(proliferation of psychiatric defenses is evidence of "disturbing trend in this therapeutic society of denying that people act of their own free will."). Requiring exhaustive and unwarranted investigation and presentation of psychiatric defenses would also send contradictory messages to attorneys, who are ethically obligated not to waste the court's time by offering testimony that is more likely to confuse jurors than to assist them in their search for the truth. Although Gagen was searching "for a defense, any kind of defense," he properly *and commendably* refrained from pursuing an insanity defense, which clearly was not supported by Prost's comments or by his interviews with the defendant (to which he brought considerable experience assessing issues of mental competency and insanity). We refuse to hold that Gagen's prudent, good-faith decision to forego an insanity defense (after investigation) constitutes ineffective assistance of counsel. Implicit in such a holding would be the notion that in order to represent a criminal defendant competently, an attorney must not only pursue each and every possible psychiatric defense, but perhaps also search out and present questionable 'expert' testimony in support of such arguments. A holding of this kind would defy common sense and contradict well-established case law, which holds (as noted above) that an attorney need not pursue defenses that are not "reasonably suggested by the apparent factual circumstances ... or the ... demeanor and conduct of the client." *Franzen*, 794 F.2d at 317.

■ Finally, we believe it is clear that this particular claim of ineffectiveness can be resolved on the basis of the "prejudice" component of *Strickland* because Jones has failed to establish "a reasonable possibility that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59, 106 S.Ct. at 370. Assuming, for the sake of argument, that Gagen's failure to request a complete psychological evaluation amounted to deficient performance, Jones was *not* prejudiced by this "failure" to investigate. It is interesting to note that two formal evaluations performed *subsequent* to the entry of the plea (one by Prost, a psychologist, and the other by Heinbecker, a psychiatrist) each concluded that

Jones was sane at the time of the commission of the murders as well as competent to participate in criminal proceedings.[11] As the district court pointed out, if these evaluations had occurred earlier, at Gagen's request, the petitioner would have been evaluated as legally sane and Gagen still would have recommended a guilty plea (a recommendation that we believe many competent defense attorneys would have felt comfortable making). In other words, *Gagen's assessment and ultimate advice to his client would have been no different.* Had Jones ignored that advice and gone to trial, the outcome most likely would have been the same, in light of the overwhelming evidence of guilt.[12] Gagen's "failure" to pursue an insanity defense therefore did not result in prejudice, much less a "fundamentally unfair or unreliable result," *Fretwell,* 506 U.S. at 368, 113 S.Ct. at 842, and cannot support a claim of ineffectiveness.

Another claim made by the petitioner that merits discussion is his assertion that Gagen pressured him into pleading guilty. According to Jones, Gagen suggested that the sentencing judge (Hoban) would not impose the death penalty if Jones pleaded guilty because the judge knew Gagen and owed him a favor. Jones now maintains [13] that he did not want to plead guilty, but that Gagen persuaded him to change his mind at the last minute by telling him that Judge Hoban owed him a favor and that consequently, he was unlikely to sentence Jones to death. Jones's mother, Laverne Harold, and his friend, Lavonda Terry, testified that Gagen persuaded them to talk to Jones and asked them to urge Jones to plead guilty. Gagen allegedly told these women that Jones would not receive the death penalty because Judge Hoban "owed him one."

Gagen explained his comments concerning Judge Hoban and the possible imposition of a death sentence this way:

> I thought that if Andre would testify as he had talked to me about the remorse that he had, the fact that he was sorry that this had happened, that I thought that knowing Judge Hoban as I did that I felt that we had a shot at not getting the death penalty.

> [W]e had many discussions, and I was very open, I thought with Mr. Jones, Andre, and told him that I had been a Circuit Judge here in St. Clair County and that for a number of years Judge Hoban and I had worked very closely together and that I had known Judge Hoban for longer than the period of time that we had served as judges together. In fact, I had been a friend of his family and he of my parents for many years and that I knew that he was personally opposed to the death penalty and I explained to Andre that if we had any kind of chance, if we could give Judge Hoban any reason not to impose the death penalty, I didn't think that he would.

■ The accounts given by Jones and by Gagen obviously conflict, and one could legitimately question the credibility of either source: Jones is a convicted murderer with an extensive history of violent criminal conduct and drug use, while Gagen has, subsequent to Jones's trial, had his license to practice law withdrawn as a result of ethical

---

11. Prost, as recounted above, had reached this conclusion and advised Gagen of her opinion prior to the entry of the guilty plea, although her formal report was not submitted until later. *See* notes 1 and 2 *supra.*

12. The petitioner argues that, with respect to the success or failure of an insanity defense at trial, the present record is insufficiently developed to permit a prejudice inquiry. Jones relies upon a dissenting opinion in *Evans v. Meyer,* 742 F.2d 371 (7th Cir.1984), for the proposition that a prejudice inquiry under *Strickland* should not encompass the possible outcome of a trial when the court has before it only the factual basis for a plea of guilty. *Id.* at 380 (Cudahy, J., dissenting). According to the *majority* in *Evans,* however:

> It is true that if there has been no trial the record will be scantier. But when there has been a trial the record still may be incomplete because of the strategy followed by the very lawyer whose competence has been called into question; and yet the Supreme Court has made clear that the court must, in evaluating a claim of ineffective assistance of counsel, require that the claimant show actual prejudice. We do not think that requirement should be dispensed with here just because, as in the vast majority of criminal cases, the defendant pleaded guilty.

*Id.* at 374.

13. Jones testified at the evidentiary hearing conducted in connection with his second petition for post-conviction relief in December of 1987.

violations on his part.[14] Regardless of whose version one chooses to believe, Jones made two clear and unequivocal statements at the plea hearing which belie the claim he is now making that he was pressured or coerced into pleading guilty. First, Jones stated that he had not been induced to plead guilty by "any kinds of threats *or promises* whatsoever" (emphasis added). Without prompting, Jones also made clear his understanding that "the death penalty [would] be asked for even on a plea of guilty." These statements were delivered at the plea hearing, in open court, only moments after Judge Hoban warned Jones that he would not hesitate to impose the death penalty if the balance of aggravating and mitigating factors warranted such a decision. In light of Jones's clear declarations, set forth in this record, we are not persuaded that the petitioner was coerced or pressured into pleading guilty.

Gagen recognized that the chances for an acquittal were slim and developed a strategy that was perfectly reasonable under the circumstances: Jones would plead guilty, waive his right to a jury sentencing, and testify before Judge Hoban at sentencing, showing remorse for the killings. Gagen even explained this strategy to Jones, telling him *before the plea* that if he wanted "any kind of chance," he would have to "give Judge Hoban [a] reason not to impose the death penalty." Unfortunately, as discussed below, Jones thwarted this strategy by opting for jury sentencing and by refusing to testify, contrary to Gagen's advice. The fact that Gagen's strategy fell apart *subsequent to* Jones's entry of a guilty plea (in large measure because of the petitioner's decision not to testify) does not mean that Gagen's recommendation to plead guilty was unreasonable *at the time it was made*. We are mindful of the Supreme Court's admonition against second-guessing trial counsel's strategy with the benefit of hindsight, *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065, and accordingly, we refuse to hold that Gagen's advice to plead guilty constituted deficient attorney performance. The applicable standard, after all, does not presume that a lawyer is incompetent, but rather that he is competent and must be allowed considerable latitude in the exercise of professional judgment.

The petitioner's remaining claims of ineffectiveness at the plea stage[15] were addressed thoroughly by the district court and analyzed correctly in terms of *Strickland,* obviating the need for us to discuss them in detail. Although the instances of allegedly deficient attorney performance may sound ominous when set forth in a litany of accusations, it turns out that each of Gagen's challenged actions either (1) could be justified as a proper strategic decision entitled to considerable deference under *Strickland,* or (2) resulted in no prejudice. In short, after careful review of the record, we are of the opinion that these claims do not rise to the level of constitutional ineffectiveness.

### 3. Sentencing Stage

Jones claims that Gagen provided ineffective assistance of counsel during the sentencing stage of the proceedings by (1) failing to investigate or present mitigating evidence, and (2) delivering a rambling, unreasonable, and prejudicial closing argument. Our discussion will focus on the issue to which the

14. On January 13, 1986, the Illinois Supreme Court disbarred Gagen, adopting the findings of a disciplinary board which determined that Gagen made numerous false representations to clients, and that his misconduct was not a case of "inadvertent or forgetful neglect," but a matter of intentional deception. During counsel's argument before this court, Jones's present counsel made the members of the panel aware of Mr. Gagen's disbarment, in response to a question concerning Gagen's background as a public defender and a judge (the same point is also underscored in the petitioner's brief). However, the conduct for which Gagen was disbarred occurred after Jones was sentenced and involved civil proceedings completely unrelated to the Jones case. We therefore fail to see the relevance of this conduct, however ethically reprehensible, to the issue of whether Gagen represented Jones in a manner that passes constitutional muster.

15. In addition to claiming that Gagen pressured Jones into pleading guilty and asserting that he inadequately investigated possible defenses, the petitioner alleged that Gagen (1) failed to file the appropriate discovery requests or written motions, (2) withdrew previously-filed motions, (3) failed to investigate facts and subpoena witnesses, and (4) failed to negotiate a plea agreement.

parties addressed themselves at oral argument: whether Gagen provided ineffective assistance by failing to introduce mitigating evidence. According to counsel for the petitioner, Gagen's failure to introduce this evidence amounted to ineffective assistance and prejudiced Jones by "fundamentally taint[ing]" the deliberations of the sentencing jury. We do not agree.

To establish ineffective assistance during the sentencing proceedings, the petitioner must demonstrate not only deficient performance, *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065, but also prejudice. *Id.* at 695, 104 S.Ct. at 2068. In the sentencing context, prejudice may exist when "there is a reasonable probability that, absent the errors, the [sentencing authority] would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.*

On appeal, as in the district court, the petitioner asserts that the mitigating evidence that Gagen overlooked or failed to investigate properly included: (1) evidence that the murders for which Jones was convicted were committed under the influence of drugs or alcohol, (2) a history of drug and alcohol abuse, (3) a history of emotional and psychological problems, (4) a low I.Q., (5) a violent and traumatic childhood, (6) sincere remorse and guilt, (7) good behavior while incarcerated in the St. Clair County Jail, and (8) Jones's close relationship with his daughter. At first blush, Gagen's failure to present *any* mitigating evidence to Jones's sentencing jury sounds almost like *per se* ineffectiveness. However, an impartial and thorough examination of the sentencing proceedings reveals that the petitioner has failed to establish deficient performance, much less prejudice. Consequently, he has not succeeded in demonstrating constitutionally ineffective counsel.

■ As an initial matter, we observe (as the Illinois Supreme Court and the district court also noted) that according to Gagen, who questioned the petitioner during several interviews prior to the entry of the plea, Jones denied being under the influence of alcohol or drugs at the time of the offense. Therefore, the petitioner may not challenge Gagen's justifiable decision not to introduce intoxication as a mitigating factor. *Id.* at 691, 104 S.Ct. at 2066; *see also* discussion of failure to investigate defense of intoxication, *supra*, Section B.2. Furthermore, the failure to introduce evidence that Jones had a long history of substance abuse was a reasonable tactical choice because such evidence was a "double-edged sword," that is, it could easily have been considered either aggravating *or* mitigating evidence.

What about the other mitigating evidence that Gagen allegedly neglected? According to Jones, this evidence could have been established by calling Cheryl Prost (the court-employed psychologist), Laurie Elam (the petitioner's girlfriend), Talmadge Jones (the petitioner's grandmother), and/or Jones himself as witnesses. Our review of the record, discussed below, reveals that Gagen had valid strategic reasons for declining to call each of these witnesses.

■ Prost, a psychologist, consulted with Jones during the period following his arrest May 4, 1979. As noted above, Gagen, Jones's attorney, stated that he had conferred informally with Prost sometime prior to the entry of Jones's plea on August 23, at which time she advised him that Jones was competent to stand trial and sane at the time of the offenses. Thereafter, Prost documented her findings in more detail in a written report filed with the court on August 31, 1979. *See supra* note 1. After Jones confessed to the violent Wallace murders on September 1, Gagen requested and the court ordered further mental examination of Jones by psychiatrist Peter P. Heinbecker, M.D., who found that the petitioner "did not lack substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, as a result of a mental disease or defect, and furthermore ... at the present time is able to understand the nature and purpose of the proceedings against him, and is able to assist in his own defense."

Prost's formal psychological evaluation, which the petitioner asserts ought to have been introduced, contains some observations that the jury might have taken as mitigating

evidence, including a finding that Jones's I.Q. fell close to the line between "borderline retarded" and "dull average." [16] However, admitting the portions of the report favorable to the petitioner would clearly have "opened the door" for admission of the report in its entirety, including detailed and unflattering descriptions of Jones's lengthy criminal record, his "callousness, selfishness, impulsiveness and self-righteousness," and his persistent disregard for the rights of others.[17] As for Gagen's failure to call Prost as a witness, Gagen stated that as a lawyer and as a judge, he previously had had many opportunities to observe Prost testify and that, in his estimation, he "never thought she was a very good witness." A judgment call of this kind, involving a lawyer's subjective assessment of a potential witness, certainly falls within the realm of strategic decision-making and should be afforded great deference. *United States v. Kozinski,* 16 F.3d 795, 813 (7th Cir.1994) (decision whether to call a witness afforded "enormous deference").

■ Laurie Elam, Jones's girlfriend and another potential mitigation witness, arrived at the sentencing hearing adorned with a necklace that displayed the word "B–I–T–C–H" in clearly visible letters. Gagen, unable to persuade Elam to remove the necklace and mindful of the jury's likely reaction, quite sensibly abandoned his plan to call Elam as a witness.

■ The petitioner also maintains that his grandmother, Talmadge Jones, was a mitigation witness whom Gagen ought to have called at the sentencing hearing. Mrs. Jones had more or less raised Andre and could testify to various aspects of his troubled childhood. Gagen thought Mrs. Jones was "a nice lady" whom the jury would find compelling, even though calling her as a witness at the sentencing hearing would likely have served as a springboard for the Government to cross-examine her concerning her grandson's lengthy juvenile record as well as the fact that he hid the murder weapon used in the Nersesian and Brown killings at his grandmother's house. Whether Mrs. Jones would have made a good mitigation witness is beside the point, however, because Jones personally requested that his grandmother not be called to testify, and Gagen—as he was obligated to do—honored his client's wishes. Jones therefore has only himself to blame for preventing the introduction of this line of testimony as mitigation evidence. *See Davis v. Greer,* 13 F.3d 1134, 1139 (7th Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 328, 130 L.Ed.2d 287 (1994) (defendant who prevented his lawyer from presenting evidence of alleged mental illness, retardation, and troubled family background could not later challenge these decisions as ineffective assistance of counsel).

■ Perhaps the greatest blows to Gagen's strategy came from the petitioner him-

16. Under the caption "Intellectual and Achievement Assessment," Prost's report stated:

The scores on the intelligence and reading tests were *probably a low estimate of his abilities* due to the extreme stress of the recent court proceedings. His Verbal I.Q. score (79) was in the borderline range of retardation but very close to the dull average range. His Performance I.Q. score (81) was in the dull average range. On the reading test, Mr. Jones scored at the 8th grade, 5th month level, or more than adequate for daily business transactions. There was no evidence of gross neurological impairment.

(emphasis added). Jones misapplies our decision in *Brewer v. Aiken,* 935 F.2d 850 (7th Cir. 1991), in which the defendant's attorney was held to be ineffective because—unlike Gagen—he had failed to conduct "even a cursory investigation" of the mental history of his client in preparation for the sentencing phase of a death penalty case. *Id.* at 857–59. Gagen, as the foregoing

discussion should make clear, *did* conduct an investigation. Moreover, the defendant in *Brewer* had an I.Q. somewhere between 58 and 68, considerably lower than Jones. Compounding Brewer's low intelligence was a finding that he was highly susceptible to the influence of others, including, arguably, the individual who accompanied him on the crime spree that led to his conviction. There were no similar findings with respect to Jones.

17. The Illinois death penalty statute permitted a wide scope of inquiry for the sentencing jury, allowing it to "consider *any* aggravating . . . factors which are relevant to the imposition of the death penalty. Aggravating factors may include *but need not be limited to those factors set forth in Subsection (b)."* Ill.Rev.Stat. ch. 38, para. 9–1(c) (1979) (emphasis added). At least one of the aggravating factors set forth in the statute was applicable to Jones, i.e., he was "convicted of murdering two or more individuals." Ill.Rev. Stat. ch. 38, para. 9–1(b).

self, who defeated "the game plan" by (1) electing to be sentenced by a jury instead of by Judge Hoban,[18] and (2) refusing to testify at the very last minute. Gagen believed that Jones's remorse was genuine and that his testimony at least had a chance of persuading Judge Hoban not to impose the death sentence, particularly in light of Hoban's known personal opposition to the death penalty. Jones himself abandoned this strategy of testifying before the judge and possibly demonstrating remorse. He thus thwarted Gagen's plan and in all probability defeated his only hope for leniency in sentencing. Faced with a jury, and unable to rely upon Jones's testimony, Gagen could *only* resort to a plea for mercy.[19] Short of desperate measures such as fabricating mitigation evidence (clearly an unethical strategy), there was little more that Gagen could have accomplished after his client elected jury sentencing and then refused to testify at the last minute. Under *Strickland,* we must avoid the "distorting effects of hindsight" and "evaluate the [challenged] conduct from counsel's perspective at the time." 466 U.S. at 669, 104 S.Ct. at 2055. Assessing Gagen's performance without the benefit of hindsight (which of course reveals a chain of events leading to the petitioner's death sentence), we refuse to hold that his representation fell outside of the wide range of professional ability and judgment that is considered constitutionally adequate.

Finally, even assuming that Gagen's performance *was* deficient, which we do not, the petitioner has failed to establish prejudice under the second prong of the *Strickland* test. If all of the allegedly mitigating evidence had been introduced, the jury would

have learned that the petitioner had a crime-ridden childhood, combined with a history of drug and alcohol abuse, a low I.Q., *et cetera.* However, the introduction of this evidence would have "opened the door" to cross-examination and further inquiry by the state prosecutor, giving the jury knowledge of, among other things, the petitioner's self-centered and "callous" nature and his lengthy record of juvenile delinquency and serious criminal behavior.[20] The jurors would have added this prejudicial information to the mountain of already-established aggravating evidence, which included the armed robbery and killing of Richard Stoltz, the execution-style murders of Samuel Nersesian and Debra Brown, and the gruesome double murder of the Wallaces (to which Jones confessed).[21] Considering the overwhelming nature of this evidence, it is clear that even if we were to agree, for the sake of argument, that Gagen's representation was deficient, Gagen's alleged errors did not result in any prejudice, nor did they lead to a "fundamentally unfair or unreliable" result. *Fretwell,* 506 U.S. at 368, 113 S.Ct. at 842. In other words, "[t]he evidence that [petitioner] says his ... counsel should have offered at the sentencing hearing would barely have altered the sentencing profile presented." *Strickland,* 466 U.S. at 699–700, 104 S.Ct. at 2071.

### 4. No Ineffectiveness Under "Totality of Circumstances" Approach

The petitioner expresses concern that the district court "dissected" his ineffectiveness claims and treated them "in isolation," thereby failing to consider whether Gagen was ineffective under the "totality of the circumstances" approach mandated by

18. Jones initially waived his right to jury sentencing and opted to be sentenced by Judge Hoban. For reasons unexplained in the record, he changed his mind at the last minute and refused to testify.

19. We agree with the district court that while Gagen's closing argument at the sentencing hearing "does not evoke images of a brilliant trial lawyer's elocution," it does "satisfy the minimal standards of effective assistance of counsel." *Jones,* 877 F.Supp. at 1232. Moreover, it is doubtful that Gagen's closing statement resulted in prejudice. Even the rhetorical brilliance of Clarence Darrow would likely not have made a

difference in light of the overwhelming aggravating evidence and the petitioner's last-minute decision not to testify.

20. From Prost's report alone, which does not attempt a precise accounting of Jones's criminal background, the jury would have learned that Jones "had numerous other violent crimes charged to him consisting primarily of armed robbery," and that Jones's trouble with the law started when he was 9 or 10 years old.

21. The admissibility of this confession is discussed in Section C *infra.*

our case law. *See Drake,* 14 F.3d at 355. It seems to us debatable whether this is, in fact, a shortcoming of the district court's opinion. If it is, however, we take this opportunity to remedy the defect: We hold that the actions of Jones's counsel were not so serious that, when weighed and considered in their totality, they led to a "breakdown in the adversary process that renders the result unreliable." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. As noted in the foregoing discussion, and explained in detail in the district court's opinion, each of the challenged actions either (1) resulted in no prejudice, (2) could be justified in terms of strategy, or (3) were the result of circumstances beyond Gagen's control which limited his ability to represent his client effectively (e.g., Jones's refusal to testify). After reviewing and assessing the record in light of the principles in *Strickland,* and with due consideration for the "totality of the circumstances," we conclude that Jones's initial counsel, Gagen, was not constitutionally ineffective either at the plea or sentencing stages of this case. Consequently, Hoffman was not ineffective for failing to raise the issue of Gagen's alleged ineffectiveness, and the district court properly denied Jones's petition for a writ of habeas corpus based on ineffective assistance of counsel.

### C. *Sixth Amendment Claim: Admission of "Other Crimes" Evidence at Sentencing*

The petitioner claims, as he did in state court, that the evidence concerning the Wallace murders, including Jones's confession, was obtained in violation of his Sixth Amendment right to counsel and should not have been received in evidence at the sentencing hearing. The Illinois Supreme Court reached precisely the opposite conclusion, holding that the admission of this evidence was proper. *Jones I,* 68 Ill.Dec. at 910, 447 N.E.2d at 168. In the *habeas* context, to reiterate, we review questions of law *de novo,* while factual determinations of the state

courts are "presumptively correct." *Rodriguez,* 63 F.3d at 554.

The district court took a slightly different approach. Initially, it divided the encounters between Jones and the East St. Louis police into three categories: (I) the initial August 30, 1979 meeting, at which Jones was fully Mirandized, (II) the September 1 meeting, initiated by Jones, at which he gave Detective Miller a handwritten confession to the Wallace murders, and (III) a series of subsequent meetings (the details of which are unclear from the record). Regarding evidence derived from the first two encounters, including the confession, the district court found that Jones's Sixth Amendment argument could not be entertained by a federal court on collateral review because it sought the benefit of a "new rule" of constitutional law in a manner prohibited by *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). The court determined that the admission of evidence derived from the third group of meetings *did* violate the Sixth Amendment (under the law existing at the time Jones's conviction became final) but amounted to harmless error and therefore could not provide a basis for *habeas* relief.

#### 1. *Teague v. Lane*

Just as we relied upon *Strickland* in the preceding section of this opinion, the Supreme Court's decision in *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), will guide much of our analysis in this section. In *Teague,* the Supreme Court formulated a basic rule of "non-retroactivity" in *habeas* cases.[22] In order to further the goals of finality and comity, the Court announced the general principle that "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *Id.* at 310, 109 S.Ct. at 1075. "A case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Id.* at 301, 109 S.Ct. at 1070 (emphasis in original). The

---

**22.** Although *Teague* was a plurality opinion, its holding has since been affirmed by a majority of the Court and applied in its review of capital as well as noncapital habeas cases. *Saffle v. Parks,* 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990); *Butler v. McKellar,* 494 U.S. 407, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990); *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

Court's recognition of this principle reflected the view, expressed earlier by Justice Harlan, that it is "sounder, in adjudicating *habeas* petitions, generally to apply the law prevailing at the time a conviction became final than it is to seek to dispose of [such] cases on the basis of intervening changes in constitutional interpretation." *Id.* at 306, 109 S.Ct. at 1073 (quoting *Mackey v. United States*, 401 U.S. 667, 689, 91 S.Ct. 1160, 1178, 28 L.Ed.2d 404 (1971) (Harlan, J. concurring in part and dissenting in part)).

### 2. The District Court's Invocation of Teague

■ Before reaching the issue of whether Jones seeks the benefit of a "new rule" to exclude the Wallace confession, we must determine whether it was appropriate for the district court to raise the issue of a possible *Teague* bar *sua sponte*. The petitioner has repeatedly and properly characterized *Teague* as "non-jurisdictional." *See Collins v. Youngblood*, 497 U.S. 37, 41, 110 S.Ct. 2715, 2718–19, 111 L.Ed.2d 30 (1990). However, we would like to emphasize what the petitioner concedes: that while a *habeas* court is not *required* to consider the *Teague* question, it has the discretion to do so even when the State has not raised the issue. *Goeke v. Branch*, ── U.S. ──, 115 S.Ct. 1275, 1277, 131 L.Ed.2d 152 (1995); *Caspari v. Bohlen*, ── U.S. ──, ──, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994); *Schiro v. Farley*, ── U.S. ──, ──, 114 S.Ct. 783, 789, 127 L.Ed.2d 47 (1994); Pet. Brief at 81. We will not address the issue of whether the State waived its *Teague* objection, for it is clear that the district court had discretion to address the *Teague* issue even in the presence of a waiver. *Eaglin v. Welborn*, 57 F.3d 496, 499 (7th Cir.1995) (en banc), *cert. denied*, ── U.S. ──, 116 S.Ct. 421, 133 L.Ed.2d 338 (1995).

■ We do not agree with the defendant's contention that the district court abused its discretion when it raised the *Teague* issue *sua sponte*, nor do we think that the manner in which the issue was raised resulted in any unfairness to Jones. Although the *Teague* issue is not jurisdictional in the strict sense of the word, it has been described by the Supreme Court as a "threshold question," *Caspari*, ── U.S. at ──, 114 S.Ct. at 953, and the "first step" in reviewing a *habeas* case. *Schiro*, ── U.S. at ──, 114 S.Ct. at 788. As for the manner in which the issue was raised in Jones's case, we note, first, that the district court did nothing whatsoever to advocate a *Teague* bar and in fact gave both parties ample opportunity to brief and argue the issue extensively before deciding the matter. We are of the opinion that, petitioner's assertions to the contrary notwithstanding, the court in its decision fully justified its determination to address the *Teague* issue. The court called attention to the *Teague* issue out of respect for "the important policies underlying the finality of state court criminal judgments, and the non-retroactivity principles enunciated [by the Supreme Court]." 877 F.Supp. at 1232. The district court did not abuse its discretion or inappropriately raise the issue, particularly in light of its role as the initial forum for hearing a federal *habeas* petition. In fact, while a judge should never engage in advocacy from the bench, he or she has an obligation to raise legal issues that the parties have overlooked or neglected. After all, the judge is on the bench in the first place (we trust) because of superior legal background, expertise, or credentials, and for that reason "[should] not sit as a passive observer who functions solely when called upon by the parties." *Gonzalez v. Volvo of America Corp.*, 734 F.2d 1221, 1225 (7th Cir.1984); *see also United States v. Cheramie*, 520 F.2d 325, 327 (5th Cir.1975) ("a judge is more than a robed mummy presiding at trial"; he should instead be an "active, alert judicial moderator"). Rather, the judge should take an active role, when necessary, to ensure fairness and to conform the proceedings to the law.

The petitioner also claims that "raising a nonjurisdictional procedural bar to the merits of a death penalty case . . . seems directly inconsistent with the basic purpose underlying the writ of habeas corpus, to correct substantial and injurious constitutional errors." Pet. Brief at 88. We observe that ensuring fairness is but *one* of the purposes of the writ of habeas corpus. As the court made clear in *Teague*, the *habeas* process

should also protect the finality of state court judgments and ensure comity between the federal and state court systems. These policies are no less compelling in a capital case than in any other type of *habeas* case. *Penry v. Lynaugh*, 492 U.S. 302, 314, 109 S.Ct. 2934, 2944, 106 L.Ed.2d 256 (1989) ("finality concerns ... are applicable in the capital sentencing context."). This is not the first time that this court has applied *Teague* in a death penalty case, nor will it be the last. *See, e.g., Stewart v. Lane*, 60 F.3d 296 (7th Cir.1995). While, as a general matter, we approach all aspects of a death penalty case with an extra measure of care and sensitivity, the nature of this appeal makes no legal difference as far as the application of *Teague* is concerned.

### 3. *The Teague Analysis*

█ In determining whether Jones's Sixth Amendment claim is or is not barred by *Teague*, we must proceed in three steps, as mandated by the Supreme Court. *Caspari v. Bohlen*, —— U.S. at ——, 114 S.Ct. at 953 (outlining three-part analysis). First, we ascertain the date that Jones's conviction and sentence became final for *Teague* purposes. Second, we must assess the law as it then existed and determine whether a state court at that point in time would have been compelled to hold in favor of the petitioner, keeping in mind that *Teague* insulates from collateral review "reasonable, good-faith interpretations" of existing precedent. *Butler v. McKellar*, 494 U.S. 407, 414, 110 S.Ct. 1212, 1217, 108 L.Ed.2d 347 (1990). Third, if we determine that the petitioner seeks the benefit of a new rule, we must ask whether that rule falls within one of the two narrow exceptions to *Teague*.

█ The first step in our analysis is straightforward. "A state conviction and sentence become final for purposes of non-retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been denied." *Caspari*, —— U.S. at ——, 114 S.Ct. at 953 (citation omitted). Jones's conviction and sentence became final on October 17, 1983,

when the United States Supreme Court declined to review his direct appeal by denying his petition for certiorari.

█ The second part of our *Teague* analysis requires us to focus on the Illinois Supreme Court's discussion of the Sixth Amendment issue to determine whether that court's analysis was consistent with constitutional precedents as they existed in 1983. The Illinois court held:

> we find no violation of defendant's constitutional right to counsel. It is clear that defendant was no stranger to criminal proceedings and there is no claim that defendant was not aware of his right to confer with his attorney prior to giving any information to the detective. The voluntariness of defendant's participation in the interviews conducted at the St. Clair County jail is not contested. *Defendant apparently voluntarily and knowingly waived his right to have counsel present at these interviews, and therefore the information obtained pursuant to these interviews cannot be suppressed on the ground that defendant's sixth amendment right to counsel was violated.*

*Jones I,* 68 Ill.Dec. at 910, 447 N.E.2d at 168.

The Illinois Supreme Court's analysis was proper as far as it went, but it would have been more helpful to this court on *habeas* review had it made specific findings as to the various meetings involving Jones and the police, instead of describing, analyzing, and referring to them collectively as "these interviews." On the other hand, the district court did make such distinctions, finding that Jones validly waived his *Miranda* rights for purposes of the first and second meetings (August 30 and September 1, respectively), but that the record was insufficient to permit a similar finding with respect to the series of interviews that followed his confession to the Wallace murders on September 1. We agree with the district court that the record concerning these later meetings is insufficient, for it fails to establish how many times police questioned Jones subsequent to September 1, nor does it reveal the precise content or subject matter of these interviews, the length of these interviews, whether police advised Jones of his rights, or whether Jones waived

those rights. As discussed in greater detail below, the district court recognized the dearth of information in the record concerning these later meetings and, giving the *habeas* petitioner the benefit of the doubt in light of this sparse record, assumed that the evidence derived from them was erroneously admitted. However, the court determined—and we agree—that the admission of this evidence constituted harmless error.

The Illinois Supreme Court's finding that Jones "voluntarily and knowingly waived his right to have counsel present" was undeniably correct with respect to the first two meetings and certainly consistent with the extant cases concerning waiver of the right to counsel.[23] The prevailing rule in 1983 was that a waiver of the right to counsel "must not only be voluntary, but must also constitute a knowing and intelligent relinquishment of a known right or privilege, a matter which depends ... upon the particular facts and circumstances of each case." *Estelle v. Smith*, 451 U.S. 454, 471 n. 16, 101 S.Ct. 1866, 1877 n. 16, 68 L.Ed.2d 359 (1981) (quotation omitted); *see also Brewer v. Williams*, 430 U.S. 387, 403, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).

This court has held that a state court's "determination of whether a defendant understood his or her rights, and knowingly waived them, is factual" and thus entitled to a presumption of correctness under 28 U.S.C. § 2254(d). *Perri v. Director, Dept. of Corr. of Ill.*, 817 F.2d 448, 451 (7th Cir.1987), *cert. denied*, 484 U.S. 843, 108 S.Ct. 135, 98 L.Ed.2d 92 (1987). Accordingly, we review the Illinois court's conclusions deferentially. At the initial meeting on August 30, 1979, Jones was advised of his *Miranda* rights and signed a written waiver. He was therefore well-acquainted with his right to counsel when, two days later, he summoned Detective Miller to the county jail on September 1 and handed him a six-page handwritten confession to the Wallace murders. We agree

with the Illinois Supreme Court and the district court that the waiver with respect to the first meeting was as clear-cut and unambiguous as it could possibly be. We also agree that Jones's waiver of the right to counsel at the second encounter was valid and consequently, the admission of Jones's confession to the Wallace murders—used against Jones at the sentencing hearing—was not erroneous. In our opinion, the Illinois Supreme Court and the district court were correct that Jones's waiver of the right to counsel on this occasion was freely and voluntarily given (indeed, Jones himself initiated the meeting and has never argued that the confession produced at this meeting was coerced in any manner). We are also of the opinion, as were the Illinois Supreme Court and the district court, that Jones waived his right to counsel knowingly and intelligently (Jones was experienced with the criminal justice system and he had already been informed of his right to counsel when he provided the information to police in the absence of his attorney).

■ The "new rule" from which the petitioner seeks to benefit was developed in a cluster of cases decided by the United States Supreme Court in the mid to late 1980s. These cases departed from earlier precedent by holding that when police initiate interrogation and the defendant has an existing attorney-client relationship, *any* waiver of rights is invalid with respect to that police-initiated encounter. *See Patterson v. Illinois*, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988); *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986); *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). The petitioner's argument has two parts: first, because the police initiated the August 30 meeting, his waiver of the right to counsel with respect to that meeting was invalid, and second, the September 1 meeting at which he

---

**23.** The Illinois court decided the Sixth Amendment issue on waiver grounds, instead of holding that the right to counsel was not infringed because the Government did nothing to "deliberately elicit" incriminating information. *Massiah v. United States*, 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964). However, at least with respect to the meeting at which Jones

handed Detective Miller his confession (September 1), the Government did not "deliberately elicit" information from Jones, either through direct interrogation or more subtle methods. No questioning took place at this meeting—indeed, a meaningful interrogation could not take place—because Detective Miller had insufficient knowledge about the Wallace murders at that time.

produced his confession, being the "fruit" of the earlier meeting, also violated his Sixth Amendment rights.

The Supreme Court conceded, in *Teague*, that it would often be "difficult to determine when a case announces a new rule." 489 U.S. at 301, 109 S.Ct. at 1070. Generally speaking, however, a new rule is one that "breaks new ground or imposes a new obligation on the States or the Federal Government." *Id.* In other words, "a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Id.* (emphasis in original). We hold that the post–1983 cases cited by the petitioner announced a new rule. The Supreme Court, in its pre–1983 cases, acknowledged the ability of a criminal defendant to waive his right to counsel, *even when the Court found that no effective waiver had taken place under a particular set of facts. See, e.g., Estelle,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359; *Brewer,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424. The well-known *Miranda* case (although admittedly concerning the Fifth Amendment privilege against self-incrimination and not the Sixth Amendment right to counsel) stated that:

> In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.

*Miranda v. Arizona,* 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). In the mid to late 1980s, by contrast, the Court underscored the difficulty, if not the impossibility, of waiving Sixth Amendment rights under some circumstances. In *Michigan v. Jackson,* for example, the Court held that "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of the defendant's right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." 475 U.S. at 636, 106 S.Ct. at 1411. The Court later explicitly described its holding in *Jackson* as "establish[ing] ... a

new Sixth Amendment rule." *McNeil v. Wisconsin,* 501 U.S. 171, 179, 111 S.Ct. 2204, 2210, 115 L.Ed.2d 158 (1991). Not surprisingly, at least five other circuits have determined that the holding in *Jackson* represents a "new rule" for purposes of *Teague* analysis. *Flamer v. State of Delaware,* 68 F.3d 710, 720–21, 724 (3rd Cir.1995); *Bannister v. Armontrout,* 4 F.3d 1434, 1440 n. 7 (8th Cir.1993), *cert. denied* — U.S. —, 115 S.Ct. 418, 130 L.Ed.2d 333 (1994); *Self v. Collins,* 973 F.2d 1198, 1207 (5th Cir.1992), *cert. denied* 507 U.S. 996, 113 S.Ct. 1613, 123 L.Ed.2d 173 (1993); *Greenawalt v. Ricketts,* 943 F.2d 1020, 1026 (9th Cir.1991), *cert. denied,* 506 U.S. 888, 113 S.Ct. 252, 121 L.Ed.2d 184 (1992); *Collins v. Zant,* 892 F.2d 1502, 1510–12 (11th Cir.1990), *cert. denied,* 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 180 (1990).

■ Having determined that the petitioner seeks to benefit from a "new rule" in a manner prohibited by *Teague,* we proceed to the final step of our analysis and ask: Does the "new rule" outlined above fall within one of two "narrow exceptions," *Saffle v. Parks,* 494 U.S. 484, 486, 110 S.Ct. 1257, 1259, 108 L.Ed.2d 415 (1990), to the general rule of non-retroactivity outlined in *Teague?* The first of these narrow exceptions includes new rules that place " 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe.' " *Teague,* 489 U.S. at 307, 109 S.Ct. at 1073 (quoting *Mackey,* 401 U.S. at 692, 91 S.Ct. at 1180). The petitioner apparently concedes that his case does not fall within this first category, for he fails to make any argument in this regard. Nevertheless, he does explicitly argue that his case falls within the second exception to *Teague,* which is for "watershed rules of criminal procedure" that are deemed essential to the fairness of criminal proceedings. *Teague,* 489 U.S. at 311, 109 S.Ct. at 1075. The Supreme Court has interpreted this category very narrowly and we do not believe that the new rule in this case (making waiver of the right to counsel more difficult in some circumstances) falls within the "small core of rules requiring ...

procedures that are implicit in the concept of ordered liberty." *Graham v. Collins,* 506 U.S. 461, 478, 113 S.Ct. 892, 903, 122 L.Ed.2d 260 (1993) (quotations omitted). *Accord Flamer,* 68 F.3d at 723; *Zant,* 892 F.2d at 1512.

The Supreme Court has, on more than one occasion, cited its holding in *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (extending the right to counsel to all defendants charged with serious offenses), as an example of a new rule that would fall within the second category. *See Saffle,* 494 U.S. at 495, 110 S.Ct. at 1263–64. However, as the district court made clear, the petitioner "stretches the Gideon example too far" when he argues that the Sixth Amendment rule involved in this case is a "watershed" rule. *Jones,* 877 F.Supp. at 1237. By citing *Gideon* as an example, the Court did not suggest that *all* cases expanding or defining the right to counsel would fall within the exception. Rather, the Court made clear that only those cases that truly break new constitutional ground, such as *Gideon,* require retroactive application.

To summarize our analysis under *Teague:* (1) the Sixth Amendment, as interpreted in 1983, allowed the petitioner to make a knowing and voluntary waiver of his right to counsel and he did so with respect to the first two meetings; (2) Jones's Sixth Amendment argument is barred on collateral review because it seeks to take advantage of a "new rule" (developed since 1983) restricting the availability of waiver; and (3) the new rule invoked by the petitioner does not fall within either of the exceptions to *Teague* and therefore may not be applied retroactively.

### 4. Admission of Evidence Obtained in Violation of Sixth Amendment as "Harmless Error"

As discussed above, the district court determined that existing precedent at the time Jones's conviction became final did not dictate suppression of the evidence derived from the first two meetings between Miller and Jones (the key piece of evidence being, of course, Jones's confession to the Wallace murders). Thus, the petitioner's collateral *habeas* attack on the admission of this evidence is barred by *Teague v. Lane.*

Nevertheless, the district court concluded that *Teague* did not bar *all* of the petitioner's Sixth Amendment claims. The district court assumed that evidence derived from the interviews that took place *after* Jones gave the confession to Detective Miller on September 1, 1979 *was* admitted in violation of the Sixth Amendment under the law as it existed in 1983. The court made this assumption because the record would not permit a finding that Jones was informed of his *Miranda* rights at these later meetings, or that he knowingly and voluntarily waived those rights.[24] The district judge, giving the benefit of the doubt to the *habeas* petitioner in light of this unclear record, therefore proceeded on the premise that these post-confession interviews and their "fruit" (namely, the knife and testimony concerning the knife) were obtained in violation of Jones's right to counsel and erroneously admitted into evidence. We believe that this analysis of Jones's Sixth Amendment claim was proper. However, we are careful to point out (as the district court noted) that *most* of the damaging evidence about the Wallace murders was the product either of Jones's voluntary confession or of the initial interview between Miller and Jones (at which the petitioner was

---

**24.** We reiterate that under the law existing at the time Jones's conviction and sentence became final, the confession provided to Detective Miller at the September 1 meeting clearly was not obtained in violation of the right to counsel because there was a valid waiver of that right. *See* discussion *supra.* However, *Miranda* is very clear that a waiver, no matter how broad, may later be "undone" if a criminal suspect changes his mind and states his wish to have a lawyer present during questioning. *United States v. Bensinger,* 463 F.2d 576, 578 (7th Cir.1972); *Miranda v. Arizona,* 384 U.S. 436, 472–73, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966). Thus, although it

is arguable that Jones, by confessing to the Wallace murders, waived his *Miranda* rights with respect to *all* further questioning about those murders, it is possible that subsequent to the September 1 meeting he indicated a desire to have counsel present during questioning. The record concerning these later meetings is too thin to permit a finding one way or the other with respect to these *Miranda* issues. Therefore, we believe it was appropriate for the district court to err on the side of caution and assume that the evidence obtained as a result of these interviews was improperly admitted.

fully Mirandized). This evidence included the confession itself, photographs of the Wallaces' bodies and the murder scene, and testimony from Miller, the St. Clair County Coroner, an East St. Louis police officer, and the Wallaces' children.

Regarding the knife and testimony concerning the knife,[25] which *was* derived from the later interviews between Miller and Jones, the district court applied a "harmless error" analysis and concluded that the improper admission of this evidence at sentencing did not entitle Jones to *habeas* relief. We are of the opinion that the district court analyzed this issue properly.

■ Although our review of constitutional claims is plenary, a constitutional error is grounds for relief in a federal *habeas corpus* proceeding only if the error "had *[a] substantial and injurious* effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 638, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946) (emphasis added)).[26] *See also O'Neal v. McAninch,* —— U.S. ——, ——, 115 S.Ct. 992, 999, 130 L.Ed.2d 947 (1995) (holding that in close cases, i.e., where *habeas* court has "grave" doubts as to the harmlessness of an error affecting substantial rights, it should grant relief); *Davis v. Greer,* 13 F.3d 1134, 1138–39 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 328, 130 L.Ed.2d 287 (1994) (*Brecht* standard applied to evidence introduced at sentencing hearing); *Hanrahan v.*

*Thieret,* 933 F.2d 1328, 1336 (7th Cir.1991), *cert. denied,* 502 U.S. 970, 112 S.Ct. 446, 116 L.Ed.2d 464 (1991) ("Constitutional error does not require automatic reversal. On the contrary, an otherwise valid conviction need not be set aside if the error is harmless.").

■ Even if we assume, as the district court did, that *some* of the evidence surrounding the Wallace murders *was* admitted in violation of Jones's constitutional rights, we hold that the admission of this evidence did not have a "substantial or injurious effect or influence in determining the jury's verdict," and was therefore harmless error. *Brecht,* 507 U.S. at 638, 113 S.Ct. at 1722. The admission of this evidence may not serve as a basis for vacating Jones's sentence because it had *little or no injurious effect or influence:* even without this evidence, the jurors had *overwhelming* evidence from which they could conclude that Jones was a ruthless and habitual killer deserving of the death penalty. In other words, the scales were already *heavily* tipped in the direction of Jones's fitness for the death penalty. No mitigating evidence was presented at Jones's sentencing hearing, for reasons explained in the first part of this opinion. However, the jury did have before it evidence that Jones was responsible for the killings of Stoltz, Nersesian, and Brown, all of whom were shot to death while attending to their own affairs (the victims were not associated with Jones or his co-defendant in any way, nor did they do anything to provoke the shootings). The jurors also had Jones's chilling written con-

---

**25.** During his post-confession meetings with the East St. Louis police, Jones assisted in locating the knife used in the Wallace murders by arranging to have an unidentified woman deliver the knife to the jail. Later, at the sentencing hearing, Mr. Wallace's son identified the knife as one owned by his father.

**26.** Prior to the Supreme Court's decision in *Brecht,* it was unclear which "brand" of harmless error review applied in the *habeas* context. The two candidates were: (1) the *Kotteakos* "substantial and injurious effect" standard (outlined above), and (2) the *Chapman* standard, which required that a court be persuaded beyond a reasonable doubt that a constitutional error had not affected the verdict. *Chapman v. California,*

386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988) (applying *Chapman*). For an example of the debate over which standard applied, see *Hunter v. Clark,* 934 F.2d 856 (7th Cir.1991) (Coffey, J., majority opinion and Easterbrook, J., concurring opinion). *Brecht* appears to have resolved the debate in favor of the *Kotteakos* standard, which the Court described as more consistent with its recent *habeas* jurisprudence and "better tailored to the nature and purpose of collateral review than the *Chapman* standard." *Brecht,* 507 U.S. at 623, 113 S.Ct. at 1714. However, for the reasons discussed below, we believe that the error in this case would survive even the more rigorous harmless error standard set forth in *Chapman.*

fession of the violent and sadistic Wallace murders, which tells the story of how the defendant methodically decapitated an elderly couple and burned down their home to hide the evidence of his crime. As we have previously held, this confession was admissible in evidence because Jones voluntarily provided it to police, completely independent of any coercion or pressure whatsoever, and thus knowingly waived his right to counsel with respect to the confession. In light of the overwhelming evidence in this record concerning the three murders with which Jones was convicted as well as the Wallace confession, we agree with the district court that even if the additional, post-confession evidence concerning the Wallace murders was erroneously admitted, it simply could not have had a "substantial and injurious effect or influence" on the jury's sentencing determination. We certainly do not entertain "grave" doubts concerning the harmless nature of this erroneously-admitted evidence, and therefore hold that the petitioner is not entitled to *habeas* relief.

## IV. CONCLUSION

The petitioner has failed to meet the burden of establishing that he was denied the effective representation of counsel at any stage in the state proceedings, nor do his Sixth Amendment arguments survive *Teague* and harmless error analysis. The district court's dismissal of Andre Jones's petition for a writ of habeas corpus is

AFFIRMED.